Harold C. Pike and Zula Pike v. Commissioner.
Pike v. Commissioner
Docket No. 5503-70.
United States Tax Court
T.C. Memo 1971-252; 1971 Tax Ct. Memo LEXIS 77; 30 T.C.M. (CCH) 1090; T.C.M. (RIA) 71252; September 30, 1971, Filed Theodore M. Smith, 1439 Ct. Pl., Denver Colo., for the petitioners. Thomas M. Ingoldsby, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1965 and 1966 in the amounts of $517.24 and $768, respectively. The issue for decision is whether petitioner is entitled to deductions under section 162(a)(2), I.R.C. 1954, [1] for the calendar years 1965 and 1966 for amounts expended for meals, lodging and transportation while he was away from Clifton, Colorado, and if so, the amount of the deduction to which he is entitled. *78 Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, Harold C. and Zula Pike, are husband and wife who resided in Clifton, Colorado at the time of the filing of the petition herein. Petitioners filed joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Denver, Colorado. Petitioners have owned a home located in Clifton, Colorado since 1961 and during the years here in issue Zula Pike and petitioners' children lived in this house. There is an apple orchard located on petitioners' property in Clifton, Colorado. Zula Pike and petitioners' children did most of the work in connection with the orchard. Petitioners on their 1965 income tax return reported a net loss of $567.03 from this orchard operation and on their 1966 return reported net income of $138.32 from this operation. Petitioners in 1966 purchased some chinchillas which were kept on their property in Clifton. Zula Pike and the children took care of these animals. Petitioners have never derived any income from raising chinchillas. Harold C. Pike (hereinafter referred to as petitioner) is a construction equipment operator *79 by trade and is a member of the International Union of Operating Engineers, Local No. 9. Petitioner would seek employment through the union hiring hall located at Grand Junction, Colorado which was approximately 3 miles from the home he owned in Clifton, Colorado. The union hiring hall would refer its members to various contractors who would call to request the services of equipment operators. The union members would register on an "out-of-work" list, listing the types of equipment they were able to operate. The referrals were made on a first-to-sign, first-to-be-referred basis by type of equipment. Between 1961 and June 1964 petitioner was employed as a heavy equipment operator by numerous employers at various construction sites throughout the western half of the State of Colorado. During this time petitioner worked on construction sites ranging from 60 to 230 miles in various directions from his house in Clifton, Colorado. In June 1964, petitioner was working for Morrison-Knudsen Construction Company (hereinafter referred to as Morrison-Knudsen) on a powerline project. He was approached by the project manager on that job site, who asked petitioner to work for Morrison-Knudsen *80 at the Homestake project. At that time work on the Homestake project had been underway for 2 or 3 months and the only work which had been done was some excavating for fill. It was the early part of June 1964 when heavy construction operators were first needed at the project. The Homestake project, which was located between Minturn (north) and Leadville (south), Colorado, consisted of the construction of a rock-filled dam to collect water for a trans-mountain diversion system to supply water to several Colorado cities. Morrison-Knudsen had been awarded a contract in 1964 for $15,000,000 for the 1091 construction of the dam and collecting system of the Homestake project. Petitioner worked on the Homestake project from June 1964 until he was laid off in December 1964 because of weather conditions. Heavy equipment operators were not usually employed in the Rocky Mountain area of Colorado during the winter months because of the type of work they did being suspended during those months due to the severe winter weather. It was customary for heavy equipment operators in the Rocky Mountain area to apply for unemployment insurance during the winter months when they were unemployed and *81 unable to find work. Although when he was laid off in December 1964 petitioner did not expect to have an opportunity to return to work as an equipment operator until sometime in the spring of 1965, he was called back by Morrison-Knudsen to the Homestake job site on February 18, 1965, when a man had been buried in an avalanche and equipment operators were needed to find him in the snow. While petitioner had placed his name on the "out-of-work" list at the union hiring hall when he was laid off in December 1964, he was recalled to work directly by Morrison-Knudsen who did not seek an equipment operator through the union. Under the Master Agreement for the State of Colorado between the International Union of Operating Engineers, Local No. 9, and the Associated Building Contractors of Colorado, Inc., and the Signatory Highway and Heavy Engineering Contractors Negotiating Committee: Employees who are laid off because a job or project is temporarily shut down because of weather, lack of material, or other reasons beyond the control of the Contractor and who do not accept employment in the building, highway, heavy and engineering construction industry or a dispatch to a job other than *82 one to which the "short duration" rule applies, shall on the resumption of the job or project within six (6) calendar months of its being shut down, be dispatched to such job or project as called for by the Contractor by name. Under the Master Agreement petitioner had no right to insist on being recalled by name by an employer. Petitioner remained on the Homestake project job site after his return on February 18, 1965, clearing the roads of snow. The amount of work that he had depended on the amount of snow, but in fact he only missed a few days because of a lack of work. Petitioner continued to operate heavy equipment on the Homestake job site throughout the balance of 1965. Because of the unusually mild winter experienced at the Homestake job site during the winter of 1965-1966, the construction work continued through the winter. Because of being able to continue construction work all winter, work on the project which required the use of heavy construction equipment could have been completed in August 1966 except for a specification change on the dam requiring that it be made 15 feet higher than originally planned. The work of placing rock on the dam with heavy construction *83 equipment was completed in early November 1966. Petitioner was laid off on November 3, 1966, upon completion of the work which required the services of heavy equipment operators. Petitioner's work at the Homestake project was set up at 60 hours a week based on six 10-hour days each week. Sometimes he worked also on Sunday and worked 70 hours or more in a week. Petitioner had been laid off and remained unemployed during the winter months of the years 1961, 1962, 1963, 1964, 1966, and 1967. His experience was that layoffs of heavy equipment operators could occur in the Rocky Mountain area in which he usually worked at any time after Labor Day depending on weather conditions. It was only as the result of the unusually mild winter in 1965 that petitioner did not experience a work suspension from the Homestake project by Morrison-Knudsen in that year. The Homestake project would normally have as many as 300 operating engineers employed at any one time. There had been between 600 and 800 referrals by Local No. 9 of the International Union of Operating Engineers over the life of the project. In many cases these referrals involved individuals who had been previously referred and then *84 laid off. In addition, there were a number of other projects in the vicinity of the Homestake project which created an even greater demand in the area for heavy equipment operators. The demand for skilled equipment operators was so great in the summers of 1965 and 1966 that equipment operators from Arizona, Kansas, and Oklahoma would come to Colorado and register at the union hiring hall to be referred out to work. A large number of the construction workers on the Homestake project lived in 1092 trailers in Leadville, Colorado. Many remained there until the project was completed, whether they were working or whether they had been laid off during the winter months. Many of the workers had their families with them and their children would attend school in Leadville which had a population of about 4,000 people. Petitioner lived in Minturn, Colorado during the years he was working on the Homestake project. Minturn was closer to the site at which petitioner worked on the project than is Leadville. At first petitioner stayed in a hotel room which became unavailable when there was an influx of skiers into the area, then in the YMCA, later in rented apartments for a while, and finally *85 in 1966 in a trailer he purchased finally in 1966 in a trailer he purchased and lived in during the rest of the time he was in Minturn. Petitioner each workday drove from his room, apartment, or trailer to the Homestake project job site. When petitioner did not work on Sunday, he would drive to Clifton after he completed his work on Saturday and drive back to Minturn on Sunday evening. Petitioner worked at least five Sundays in 1965 and four Sundays in 1966. During the calendar year 1965, while working on the Homestake project, petitioner incurred expenses of $855 for meals and $731 for lodging in Minturn, Colorado. During the calendar year 1966, petitioner incurred expenses in the amount of $903 for meals and $440 for lodging in Minturn, Colorado, while employed on the Homestake project. Petitioners on their 1965 and 1966 Federal income tax returns deducted these amounts in each year as traveling expenses while "away from home." They also on their 1966 return claimed a deduction of $100 as depreciation on petitioner's house trailer. On their Federal income tax return for the year 1965, petitioners deducted $1,140 for business automobile expense. This deduction was computed on *86 the basis of 11,400 miles driven at 10 cents per mile. Of the 11,400 miles, 300 miles was attributed to one round trip between Minturn and Clifton (a distance of approximately 150 miles) and 11,100 miles was attributed to daily trips between Minturn and the job site of the Homestake project (a distance of approximately 22 miles). On their Federal income tax return for the year 1966, petitioners claimed $1,165.70 as a business automobile expense deduction. The deduction was computed on the basis of 11,652 miles at 10 cents per mile. Of the 11,652 miles, 300 miles was attributed to one round trip between Minturn and Clifton, Colorado, and the remaining 11,352 miles was attributed to daily round trips between Minturn and the job site on the Homestake project. Respondent in his notice of deficiency disallowed the claimed deductions in the amounts of $2,726 and $2,608.20 [2] for the taxable years 1965 and 1966, respectively, for travel expenses while "away from home." Petitioners *87 in an amended petition alleged that they should be allowed an additional deduction not claimed on their return for the cost of driving 44 round trips from Minturn to Clifton in 1965 and 43 round trips in 1966 each such round trip consisting of 300 miles. The additional deduction was computed by petitioners at $1,320 for 1965 and $1,290 for 1966. Ultimate Finding of Fact Petitioner's employment by Morrison-Knudsen at the Homestake project during the years 1965 and 1966 was of an indefinite nature. Opinion Section 162(a)(2) provides for the deduction of ordinary and necessary business expenses including traveling expenses while away from home in the pursuit of a trade or business. In order to be deductible, traveling expenses must be (1) reasonable and necessary; (2) "incurred in pursuit of business," and (3) "incurred 'while away from home'." Commissioner v. Flowers, 326 U.S. 496 (1946). Respondent takes the position that the expenses incurred by petitioner at Minturn and in driving from Clifton to Minturn are not deductible since petitioner was not away from "home" as that term is used in the statute when he was in Minturn working on the Homestake project. *88 We have held that "home" as used in section 162(a)(2) refers to a taxpayer's principal place of employment. Ronald D. Kroll, 49 T.C. 557, 561 (1968). An exception to this general rule has been recognized. Under the exception the taxpayer's principal place of employment is 1093 not his "home" where his employment there is "temporary" as distinguished from "indefinite" or "indeterminate." See Kermit L. Claunch, 29 T.C. 1047 (1958), affirmed 264 F. 2d 309 (C.A. 5, 1959). See also Peurifoy v. Commissioner, 358 U.S. 59 (1958). Petitioner argues that when he was laid off in December 1964, his employment at the Homestake project was terminated. He further asserts that had it not been for an unusually mild winter in 1965 he would have been laid off in December of that year, his employment again being terminated. Petitioner states that because of his winter layoff in December 1964, and unusual circumstances being the reason he was not laid off in 1965, his work at the Homestake project was for successive periods of "temporary" employment, rather than for one period of indefinite employment. In our view the fact that petitioner was *89 laid off in 1964 and "could" have been laid off in 1965 had it not been an unusually mild winter and the fact that he registered on the "out-of-work" list at the union hiring hall when he was laid off, does not in and of itself cause his employment on the Homestake project to be "temporary" in nature. Edward F. Blatnick, 56 T.C. - (Sept. 22, 1971). Kermit L. Claunch, supra at 1051-1052. As a construction worker, petitioner had experienced numerous jobs at varying locations lasting relatively short periods in duration prior to the taxable years in issue. In June 1964, when petitioner was working for Morrison-Knudsen he was asked by his superior in that firm to take employment on the Homestake project which was located between Minturn and Leadville, Colorado. The Homestake project was a very large construction project. Heavy construction work on that project would be expected to extend over a period of 2 to 3 years. Although it was generally necessary to suspend heavy equipment operations in the Rocky Mountain area of Colorado during the winter months because of weather conditions, the size and nature of the Homestake project was such that petitioner could reasonably *90 anticipate that his employment would be renewed at that project with the resumption of work on the project. Certainly the provision for recall in the union contract, when considered in light of the fact that petitioner was originally directly requested by the contractor to go to work on the project and the fact that he was recalled directly on February 18, 1965, after the December 1964 layoff, is indicative that such an expectation would be reasonable. The record as a whole shows that petitioner did in fact anticipate working for an "indeterminate" or "indefinite" period at the Homestake project except for winter layoffs. Petitioner's own testimony shows that after he started work on the Homestake project in June 1964, he not only considered it a reasonable probability, but even had an expectation that he would return to work on that project in the spring of 1965 after having been laid off in December 1964, and there are several indications in his testimony that he considered it probable that he would work on the project whenever the heavy construction operation was not shut down because of weather conditions until such operation on the project was completed. While petitioner's *91 employment possessed a quality of impermanence, it was not "temporary" in the sense that he could reasonably expect his employment to terminate within a fixed or short period of time. Petitioner was not therefore "away from home" within the meaning of section 162(a)(2). Peurifoy v. Commissioner, supra. As we noted in Leo M. Verner, 39 T.C. 749, 754 (1963), "'Temporary' employment may become 'indefinite' since reasonable foreseeability is a function of an ever-changing factual context." Even if petitioner's original employment at the Homestake project could have been considered temporary, a fact not established by this record, the evidence shows that by February 18, 1965, it had become indefinite. We therefore conclude that since petitioner's employment with Morrison-Knudsen on the Homestake project in 1965 and 1966 was "indefinite," the expenses he incurred for meals, lodging, and transportation from Minturn to the work site in those years are not deductible as traveling expenses while away from home. In our view the expenses of petitioner's trips between Minturn and Clifton, Colorado in each of the taxable years in issue were personal expenses and are *92 not deductible. Ray A. Smith [Dec. 24,096], 33 T.C. 1059, 1064 (1960). Petitioner does not precisely argue that these expenses were incurred in the pursuit of his purported apple orchard and chinchilla farm businesses in Clifton but does intimate in his brief that such might be the fact. This record contains no 1094 evidence that petitioner's trips from Minturn to Clifton were for the purpose of working on or looking after the apple orchard or the chinchillas. The reasonable inference from the record is that the trips were not for this purpose but were for the purpose of visiting his family. Petitioner testified that his family looked after the orchard and the chinchillas. Therefore, even if these activities could be considered as businesses, which is not proved by this record, petitioner has totally failed to show that his trips to Clifton were in any way connected with these businesses. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. The actual amount of the deduction was $3,951.20 of which $1,343 was a mathematical error of the double inclusion of expenses of meals and lodging ($903 and $440), which was conceded by petitioner.↩